# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# STATESBORO DIVISION

IN THE MATTER OF:    )
          )
INSPECTION OF THE WORK )
ESTABLISHMENT KNOWN AS )
CRIDER POULTRY, INC.   ) Case No. MC610-001
CONSISTING OF ONE OR MORE )
BUILDINGS LOCATED AT 1  )
PLANT AVENUE, STILLMORE, )
EMANUEL COUNTY, GEORGIA, )
30464.         )

## REPORT AND RECOMMENDATION

Crider Poultry, Inc., ("Crider") has filed an emergency motion to quash an administrative warrant permitting the Occupational Safety and Health Administration ("OSHA") to conduct a comprehensive, "wall to wall" examination of its Stillmore, Georgia poultry slaughtering and processing plant. (Doc. 4.)[1] The Court stayed the warrant's execution and ordered OSHA to submit a responsive pleading.[2] (Doc. 5.) OSHA

---

[1] Except where otherwise indicated, all of the Court's references to a given document and any exhibit utilize the electronic docket (CM/ECF) "electronic screen-print" pagination, rather than the actual pagination ink-printed on each item's paper version.

[2] When an administrative inspection has already occurred, an inspectee must exhaust its administrative remedies before raising, as Crider does here, a constitutional search claim in federal court. *Baldwin Metals Co. v. Donovan*, 642 F.2d 768, 774 (5th Cir. 1981). The *Baldwin Metals* court reasoned that since the injury caused by a search has already occurred, little is lost by requiring administrative exhaustion. *Id.*; *Donovan v. Sarasota Concrete Co.*, 693 F.2d 1061, 1064 n. 3 (11th Cir. 1982) ("challenges to an executed administrative warrant [thus] must first pass through the administrative process"). Here, however, the

has done so, and the issue is now fully briefed.   (Doc. 7.)

# I.   BACKGROUND

## A.   Pre-Warrant Inspection

Crider's poultry processing facility consists of two plants: a slaughter plant and a cook plant.[3]   (Doc. 4 at 5-6.)   In 2009, OSHA received a complaint alleging that occupational safety and health hazards existed at the worksite.   Specifically, the complainant reported that three amputation or crushing injuries had occurred in the slaughter plant's packaging department and that employees are not able to easily find fire extinguishers throughout the facility.   (It is unclear whether the fire extinguisher issue extends to both the slaughter and cook plants.)   (Doc. 1-2 at 1.)   On November 25, 2009, OSHA Compliance Officer Kenneth Ewing arrived at the facility to carry out an inspection based upon the complaint items.   (Doc. 1-5 at 3; doc. 4 at 6.)   Shortly after he arrived, he met with Crider officials to explain the purpose of his

---

warrant-based search has not yet begun, so there is still the possibility of avoiding further injury.   Accordingly, exhaustion is not required.

[3] The two plants fall under different Standard Industrial Classification ("SIC") codes established by the agency for classifying industries.   The "slaughter" plant falls under SIC 2015 and the "cook" plant is classified as SIC 2011 and 2099.   (Doc. 4 at 5-6.)

visit, and Crider consented to the inspection. (Doc. 1-5 at 3; doc. 4 at 6.) That afternoon, Ewing conducted an initial walkthrough of the slaughter plant for complaint items. (Doc. 1-5 at 4.) He returned after Thanksgiving and spent three days, December 2nd, 3rd, and 4th, inspecting the facility, conducting interviews, and reviewing records. (*Id.*) Ewing states that on December 4th, a Friday, he notified Crider management of several "plain view" hazards he observed, including fall hazards, trip hazards, electrical hazards, and lock-out/tag-out hazards (special procedures that safeguard employees from the unexpected startup of machinery and equipment).[4] (*Id.* at 5.) Ewing did not return to the facility the following Monday because he was directed to investigate a separate event. The next day, December 8, 2009, Ewing received a message from Crider's Human Resources VP, Chuck Yarbrough, who directed him to contact Crider's attorney, Mark Waschak, to coordinate any future visits. (*Id.*) Ewing finally returned to the worksite on December 16, 2009 and attempted to interview

---

[4] Crider contends that Ewing has attempted to use the plain view doctrine to extend his search into a general exploratory inspection. For instance, he used "a device to test an electrical outlet that show[ed] no outward sign of representing a hazard," but asserted that he could do so because the outlet was in plain view. (Doc. 9 at 5-6.)

Tommy Watson, the marinating area supervisor, but Waschak (who was present) objected to certain questions.[5]  (Doc. 1 at 5-6; doc. 4 at 8.)  The next day, Ewing convened a conference attended by Waschak, Yarbrough, Safety Manager Shelly Moore, and Meat Purchasing VP Bill Crider.  (Doc. 1-5 at 6; doc. 4 at 5.)  Ewing states:

> I started by thanking the individuals present for taking the time to meet with me.  I presented my credentials and explained the purpose of the OSHA visit and the investigative process, including inspections of the workplace and interviews of management and employees.  I explained the complaint items that initiated the inspection, and the application of the Amputation [National Emphasis Program] and Sanitation [Local Emphasis Program] due to Crider's SIC code.  I also stated that I had observed possible violations of safety or health standards in plain view during my inspections of the Worksite up to that time, which necessitated further interviews.  I acknowledged the Employer's right to have legal representation during the fact-finding process but advised that Mr. Waschak's constant interruptions during interviews would be highly disruptive of the interview process.
>
> Mr. Crider responded by stating that he appreciated my candor and for letting him know about my concerns.  Mr. Crider stated that I should continue to let someone know if he does not receive the support that he needs.  Mr. Waschak stated that he would try not to interrupt and to do a better job at briefing management

---

[5] Ewing states that Crider's attorney interrupted the interview and spoke for Watson rather than allowing him to answer the questions.  (Doc. 1-5 at 6.)  Crider, on the other hand, states that counsel simply advised Watson not to answer unless he was sure his answer was correct, not to answer if he did not have personal knowledge, not to provide opinions, and not to answer leading questions.  (Doc. 4 at 5; doc. 4-4 (Shelly Moore Affidavit) ¶ 9.)

personnel prior to interviews to prevent further interruptions. The meeting concluded at approximately 9:26 a.m.

(Doc. 1-5 at 8.)   Crider paints a very different picture:

Mr. Ewing began by stating that he called the meeting to address an issue that had come up since his investigation began.   Although he recognized that Crider had a right to counsel, Mr. Ewing said that he would like Crider to consider that (1) this raised a question with his senior management that perhaps the company had "something to hide," (2) that the company's counsel's request for a break in the inspection the following week (which was the week of Christmas) also raised a question that the company was trying to hide something; and (3) that he was very thorough and that he would do his job whether counsel was present or not.   (Yarbrough aff., ¶9; Moore aff., ¶10).   Mr. Ewing added that the company was spending "a lot of unnecessary money on legal counsel" and "what is typically a very laborious activity is going to get even more laborious because of Mr. Waschak's involvement."   *Id*.   He added that currently he was not "turning over every rock," but "if this is going to be an adversarial process, that is what" he would do.   He said he just wanted the company to be aware of and "consider its options."   *Id*.   Mr. Yarbrough's and Ms. Moore's impression at the conclusion of that meeting was that Mr. Ewing was trying to dissuade Crider from having legal counsel in general and Mr. Waschak as counsel in particular, and that Mr. Ewing would "make Crider pay" for being represented by an attorney.   *Id*.

Mr. Bill Crider informed Mr. Ewing that he was not the owner of the company, and it was not for him to decide whether it would have counsel or not.   Mr. Crider further stated that Crider had been cooperating in the inspection, and would continue to cooperate in the inspection.   Mr. Yarbrough stated to both Mr. Ewing and Mr. Crider that he had not anticipated that this meeting was a new opening conference, and if he (Mr. Ewing) had any additional questions concerning the OSHA inspection, he should

direct them to Mr. Yarbrough or Mr. Waschak. (Yarbrough aff., ¶9).

(Doc. 4 at 8-9.)

The next day, Ewing returned to the facility and was, for the first time, permitted to inspect parts of the cook plant based upon amputation reports he uncovered after reviewing the facility's log of work-related accidents ("OSHA 300 logs").[6] (Doc. 1-5 at 8; doc. 4 at 9.) He returned on December 28, 2009 and requested several documents. (Doc. 1-5 at 8-9; doc. 4 at 6-7.) Ewing states that Waschak confronted him, saying that he "believed [Ewing] had threatened [Crider]" at the December 17, 2009 meeting and then Waschak denied him further entry to the facility. (Doc. 1-5 at 9.) Ewing reported the incident to his supervisor, Area Director Bob Vazzi, who negotiated with Crider to allow OSHA to reenter the facility.[7] (*Id.* at 9-10.) On January 19, 2010, Ewing returned and was permitted to interview several employees. (*Id.* at 10.) Either that day or the next (Crider's account differs from Ewing's),

---

[6] OSHA 300 logs contain a listing of work-related injuries and illnesses. *See* 29 C.F.R. § 1904.7. They are maintained by employers and need only be produced upon request. *See* 26 C.F.R. §§ 1904.40 & 1904.41.

[7] Attached to OSHA's response brief, Ewing submitted a supplemental affidavit stating that he did not threaten or retaliate against Crider. (Doc. 7-2.)

Crider informed Ewing that it would no longer provide him with documents responsive to his requests without a written showing of probable cause as to each item, and because the employee interviews were becoming burdensome it would no longer allow him to conduct interviews "on the clock." (Doc. 1-5 at 10-11; doc. 4 at 10.) Ewing then requested permission to conduct a walkthrough related to amputation hazards, and Waschak, after consulting with Yarbrough, returned and informed Ewing that he would have to get a warrant to perform any further inspections.[8] (Doc. 1-5 at 11; doc. 4 at 10.)

## B.   The Warrant

On January 21, 2010, OSHA applied for a warrant so that it could continue its inspection. (Doc. 1.) Citing sections 8(a) and 8(f) of the Occupational Safety and Health Act, 18 U.S.C. § 657(a) & (f), its Field Operations Manual ("FOM"), and 29 C.F.R. § 1903.11, OSHA sought broad permission to perform a comprehensive inspection of the entire Crider facility.[9] (Doc. 2 at 10.) It asserted that the complaint was

---

[8] In total, Ewing was permitted to inspect approximately one-quarter of the facility. (Doc. 7-2 at 3 (supplemental Ewing Aff.).)

[9] According to OSHA's FOM, a "comprehensive inspection is a substantially complete and thorough inspection of all potentially hazardous areas of the

formalized in accordance with the OSHA's National Emphasis Program on Amputations ("NEP") and the Local Emphasis Program on Sanitation ("LEP"), which required a broader inspection. (Doc. 2 at 12-13.) Based upon its administrative probable cause showing, OSHA requested a site-wide, comprehensive inspection extending to all complaint-related items, all items encompassed by the Amputation NEP and the Sanitation LEP, hazards in plain view, hazards communicated by employees during interviews, and all hazards detected through review of records. (*Id.* at 15-16.) In addition, it sought permission to extend the inspection "to include investigations by an OSHA Industrial Hygienist and Process Safety Management ('PSM') specialist, if OSHA finds that such referrals are warranted due to ergonomic-injury hazards, employee exposure to hazardous materials or other hazards addressed by OSHA health standards." (*Id.* at 17.) On January 22, 2010, the Court signed the warrant. (Doc. 3.) On January 26, 2010, before the inspection had commenced, Crider filed its motion to quash. (Doc. 4.) The Court stayed the warrant's execution so that the motion to quash could be

establishment." OSHA FOM § 3-6 (Nov. 9, 2009), available at http://www.osha.gov/OshDoc/Directive_pdf/CPL_02-00-148.pdf.

resolved.  (Doc. 5.)

## II.  **GOVERNING STANDARDS**

"[T]he Fourth Amendment prohibition against unreasonable searches protects against warrantless intrusions during civil . . . investigations." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978) (holding that § 8(a) of the OSHA Act, 29 U.S.C. § 657(a), is unconstitutional to the extent it permits warrantless inspections).  That is because the "owner of a business has not, by the necessary utilization of employees in his operation, thrown open the areas where employees alone are permitted to the warrantless scrutiny of Government agents." *Id.* at 315; *see also Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984) (noting that government officials may not "make nonconsensual entries into areas not open to the public" in a business).  "That an employee is free to report, and the Government is free to use, any evidence of noncompliance with OSHA that the employee observes furnishes no justification for federal agents to enter a place of business from which the public is restricted and to conduct their own warrantless search." *Barlow's*, 436 U.S. at 315.  The primary motivation behind the

application of the rule in civil cases is to "protect citizens from the 'unbridled discretion [of] executive and administrative officers.'" *Bruce v. Berry*, 498 F.3d 1232, 1240 (11th Cir. 2007) (quoting *Barlow's*, 436 U.S. at 323). Since Fourth Amendment search and seizure principles apply in the administrative inspections context, once a business withdraws its consent to an inspection, the government must seek out a warrant supported by probable cause. *Barlow's*, 436 U.S. at 313.

The probable cause inquiry is generally less rigorous than in the criminal context, however:

> To obtain an OSHA inspection warrant, the Secretary need not show probable cause in the criminal sense. *Marshall v. Barlow's, Inc., supra*, 436 U.S. at 320-21, 98 S.Ct. at 1824-25. Instead, the Secretary need only establish administrative probable cause, which is tested by a standard of reasonableness, requiring the magistrate or judge to "balance the need to search against the invasion in which the search entails." *Camara v. Municipal Court*, 387 U.S. 523, 537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967). In *Barlow's*, the Supreme Court observed that administrative probable cause justifying the issuance of an OSHA inspection warrant may be based either on 1) specific evidence of an existing violation; or 2) "a showing that 'reasonable legislative or administrative standards for conducting an ... inspection are satisfied with respect to a particular (establishment).' *Camara v. Municipal Court*, 387 U.S. at 538 (87 S.Ct. at 1736)." *Marshall v. Barlow's, Inc., supra*, 436 U.S. at 320-21, 98 S.Ct. at 1824-25. *See United States v. Mississippi Power & Light Co.*, 638 F.2d 899 (5th Cir. 1981). Either showing is sufficient to insure that "the decision to enter

and inspect ... (is not) the product of the unreviewed discretion of the enforcement officer in the field." *See v. City of Seattle*, 387 U.S. 541, 545, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943 (1967). *See, e.g., Marshall v. Barlow's, Inc., supra*, 436 U.S. at 323, 98 S.Ct. at 1826; *Burkart Randall Div. of Textron, Inc. v. Marshall*, 625 F.2d 1313, 1325 (7th Cir. 1980).

*West Point-Pepperell v. Donovan*, 689 F.2d 950, 957 (11th Cir. 1982) (footnotes omitted). While the standard for the issuance of an administrative inspection warrant is not stringent, the Court must be satisfied that the search request is not the product of mal-intent or arbitrariness by a vindictive employee or abusive "field inspector." *Id*. at 958.

It is also worth bearing in mind that OSHA inspections are fundamentally different from criminal searches in another respect, for such inspections are targeted at protecting employees' health and safety. Thus, unlike a criminal proceeding where a defendant may "flush" evidence, "the risk that the employer will correct the violations before the inspector reappears is not really seen as a problem: if the violations are permanently corrected, then the ultimate objective of the inspection system has been achieved". 5 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 10.2(e) (4th ed. 2009).

## III. ANALYSIS

Crider takes issue with the scope of the inspection authorized by the warrant. (Doc. 4 at 1.) It raises several issues, but only two merit serious discussion. First, Crider contends that because this is a complaint-based inspection, the scope of such inspection must be limited solely to complaint items. (*Id.* at 11-17; doc. 9 at 4-6.) Next, it argues that the Amputation NEP and Sanitation LEP do not apply, since it was not targeted for an inspection based upon a neutral administrative plan.[10] (Doc. 4 at 11-17; doc. 9 at 6-9.)

### A. Complaint-Based Inspections

Properly framing Crider's argument that complaint-based inspections cannot be expanded beyond complaint items requires a brief discussion of the Occupational Safety and Health Act of 1970. Two of the Act's statutory inspection triggers are at play here—sections 8(a) and (f). "Section 8(a) clothes the Secretary with the general power to enter

---

[10] Crider also contends that OSHA expanded the scope of the warrant in direct retaliation for its assertion of its Fourth and Sixth Amendment rights and that its insistence that employee interviews be conducted "on the clock" constitutes an impermissible taking under the Fifth Amendment. (Doc. 4 at 3, 5, 19-20.) The Court need not reach the issues since the warrant is legally deficient in other respects, as discussed below.

and inspect workplaces in order to carry out the purposes of the Act;

section 8(f)(1) specifically requires the Secretary to conduct a 'special

inspection' as soon as practicable whenever the Secretary receives a

written employee complaint that leads the Secretary reasonably to

believe that a violation exists at the workplace." *West Point-Pepperell*,

689 F.2d at 956 (footnotes omitted). Section 8(a) is the more permissive

of the two, especially where OSHA can show that the inspection is

programmed pursuant to a neutral plan. *Barlow's*, 436 U.S. at 320-21.

Section 8(f) employee-complaint inspections, in contrast, require a more

careful analysis. That is, when an inspection is triggered by a

complaint,

> a more individualized inquiry is required. *See Michigan v. Tyler*,
> 436 U.S. 499, 507, 98 S.Ct. 1942, 1948-1949, 56 L.Ed.2d 486 (1978).
> This distinction is drawn because employee complaints lack the
> administrative and legislative guidelines that ensure that the target
> of the search was not chosen for the purpose of harassment. *See
> id.*; *Marshall v. Horn Seed Co.*, 647 F.2d 96, 101 (10th Cir. 1981);
> *Burkart Randall Division of Textron, Inc. v. Marshall*, 625 F.2d
> 1313, 1327-28 (7th Cir. 1980) (Wood, J., dissenting). Because of
> this increased danger of abuse of discretion and intrusiveness, we
> join those courts that have recognized that a complaint inspection
> must bear an appropriate relationship to the violation alleged in
> the complaint. *E.g., Horn Seed Co., supra*; *Marshall v. North
> American Car Co.*, 626 F.2d 320, 324 (3d Cir. 1980); *Marshall v.
> Central Mine Equipment Co.*, 608 F.2d 719, 720-21 n.1 (8th Cir.

1979); *In re Establishment Inspection of Asarco, Inc.*, 508 F. Supp. 350, 353 (N.D. Tex. 1981); *West Point-Pepperell, Inc. v. Marshall*, 496 F. Supp. 1178, 1186 (N.D. Ga. 1980), *rev'd on other grounds*, 689 F.2d 950 (11th Cir.1982); *Marshall v. Pool Offshore Co.*, 467 F. Supp. 978, 981-82 (W.D. La. 1979).

*Sarasota Concrete*, 693 F.2d at 1068-69.[11]

Relying on *Sarasota Concrete*, Crider argues that as this inspection

---

[11] One passage in *Sarasota Concrete* suggests that § 8(a) applies *only* when a search is pursuant to a neutral administrative plan:

> An inspection under section 8(a) may be conducted in accordance with a general administrative plan. 29 U.S.C. § 657(a). An inspection under section 8(f), on the other hand, may be conducted as a result of an employee complaint. 29 U.S.C. § 657(f). Probable cause for an administrative warrant therefore may consist of either a showing that the inspection is pursuant to reasonable administrative standards or specific evidence of an existing violation. *Barlow's*, 436 U.S. at 320-21, 98 S.Ct. at 1824-1825.

*Sarasota Concrete*, 693 F.2d at 1068 (footnote omitted). Such a broad reading of the language would be a mistake, since it would directly contravene *Barlow's*, upon which *Sarasota Concrete* relied:

> For purposes of an administrative search [pursuant to § 8(a)], probable cause justifying the issuance of a warrant may be based *not only on specific evidence of an existing violation* but also on a showing that "reasonable legislative or administrative standards for conducting an ... inspection are satisfied with respect to a particular [establishment]." *Camara v. Municipal Court*, 387 U.S., at 538, 87 S.Ct., at 1736. A warrant showing that a specific business has been chosen for an OSHA search on the basis of a general administrative plan for the enforcement of the Act derived from neutral sources such as, for example, dispersion of employees in various types of industries across a given area, and the desired frequency of searches in any of the lesser divisions of the area, would protect an employer's Fourth Amendment rights.

*Barlow's*, 436 U.S. at 320-21 (footnotes omitted and alterations in original; emphasis added); *see Martin v. Int'l Matex Tank Terminals--Bayonne*, 928 F.2d 614, 623 (3d Cir. 1991) (rejecting district court's finding that all section 8(a) inspections must be programmed inspections pursuant to neutral administrative plans).

was triggered by an employee complaint, the scope of the inspection cannot be expanded beyond complaint items, and it already complied with the complaint-item inspection.  (Doc. 4 at 5, 13-15, 17.)  Hence, it reasons, the warrant should be quashed.  (*Id.*)  OSHA, however, correctly asserts that a showing of probable cause is all that is necessary to expand the scope of the inspection beyond complaint items.  (Doc. 7 at 7.)  While the initial inspection here was triggered by a complaint, the warrant was issued based upon the complaint *and* evidence of violations uncovered during the consented-to inspection.[12]  Crediting Ewing's factual averments for the sake of this Order, OSHA has shown probable cause to expand the scope of the search, since Ewing observed several Act

---

[12] OSHA argues that even if this still qualifies as a complaint-based inspection, several out-of-circuit cases establish the principle that OSHA inspections arising from employee complaints should not be restricted to investigation of the precise problems complained of and nothing more."  (Doc. 7 at 5.)  It cites *Hern Iron Works, Inc. v. Donovan*, 670 F.2d 838 (9th Cir. 1982) (permitting expansion of inspection based upon ventilation system complaint), and *Reich v. Montana Sulpher & Chemical Co.*, 32 F.3d 440 (9th Cir. 1994) (permitting expansion of investigation from complaint regarding x-raying of welds and certification of welders to general inquiry into employer's welding).  The Eleventh Circuit, however, explicitly stated that "to the extent that those courts hold that an inspection need not bear a reasonable relationship to the alleged violation, we reject their conclusion."  *Sarasota Concrete*, 693 F.2d at 1069.  In addition, *Hern* is factually distinguishable, since it involved a complaint that pertained to the company's ventilation system and thus an inspection of the entire facility was necessary to detect such a permeating hazard.  *Id.*  That opinion also cites to 29 C.F.R. § 1903.11(b), which directs that inspections pursuant to an employee complaint "shall not be limited to matters in the complaint."  (Doc. 7 at 6.)  The Eleventh Circuit did not find the argument persuasive to the extent that it suggests that an inspection may contravene Fourth Amendment principles against "general warrants."  *Sarasota Concrete*, 693 F.2d at 1069 n. 10.

violations during his inspections, learned of new information during his interviews, and discovered other potentially unsafe amputation and crushing hazards through his inspection of Crider's OSHA 300 logs. That is, Crider's consent to the inspection took this case out of the general line of § 8(f) cases requiring that complaint-based warrants be properly limited *solely* to the scope of the complaint. *Compare Donovan v. Burlington Northern Inc.*, 521 F. Supp. 99, 102 n.3 (D.C. Mont. 1981), *rev'd on other grounds*, 694 F.2d 1213 (9th Cir. 1982) (the limited nature of a complaint-based inspection does not require a compliance officer to close his eyes and ignore violations that he sees in plain view), *with Sarasota Concrete*, 693 F.2d at 1063 (employer denied *any* entry onto the facility based upon its policy against warrantless inspections, hence no information supported a broader-in-scope warrant); *see also Martin v. Int'l Matex Tank Terminals-Bayonne*, 928 F.2d 614, 623 (3d Cir. 1991) (holding that a complaint is only one type of specific evidence that a magistrate may evaluate in determining whether probable cause to inspect is established).[13] Hence, as this was no longer a simple

---

[13] OSHA's FOM also speaks to the issue. "Under certain circumstances, a second warrant may be sought to expand an inspection based on a records review or

16

complaint-based search, the warrant could permissibly exceed the complaint's scope.

## B.    Emphasis Programs

While a complaint-based inspection may be expanded based upon a probable cause showing of other violations, OSHA goes a step further and argues that it was not only authorized to conduct further investigation of the items uncovered during Ewing's inspection, but that it was permitted to conduct a comprehensive inspection of the entire facility.   (Doc. 2 at 10, 12.)   Crider insists that this goes too far.

OSHA attached and referenced two emphasis programs in seeking its warrant.   The Amputation NEP permits, in certain circumstances, site-wide inspections of workplace machinery and equipment associated with amputation injuries.   (Doc. 1-3 at 8.)   The Sanitation LEP is much broader.   It states that if a compliance officer "enters a [food and beverage manufacturing] facility to perform a complaint inspection, the compliance officer 'shall inspect' the sanitation and clean-up items identified in the sanitation program."   (Doc. 7 at 17.)   That includes (1)

---

"plain view" observations of other potential violations discovered during a limited scope walkaround."   OSHA FOM § 15-10.

lockout/tagout and guarding of equipment, (2) protection from chemical and physical hazards including appropriate personal protective equipment, (3) prevention of slips, trips, and falls, (4) prevention of cuts and lacerations, and (5) prevention of electrical shock. (*Id.* at 16.) In other words, whenever a compliance officer enters a food manufacturing facility pursuant to a complaint, the Amputation NEP and Sanitation LEP basically *compel* him to perform a comprehensive inspection, thus dramatically increasing the scope of his search.

In its warrant application, OSHA insisted that a comprehensive search was warranted based upon the Amputation NEP and Sanitation LEP. (*Id.* at 10, 12.) Indeed, it stated that the Amputation NEP and Sanitation LEP *require* the inspection to extend beyond specific complaint items and that the complaint's allegations were formalized in accordance with the Amputation NEP. (*Id.* at 12.) Crider counters that reliance upon the NEP and LEP plans is improper, and that OSHA's attempt to bootstrap them into the analysis contravenes *Barlow's*. (Doc. 4 at 11-17.) The Court agrees.

In a remarkably similar case to this one, the Sixth Circuit held that

OSHA may not rely upon neutral regulations to expand an unprogrammed [14] complaint-based inspection into a full-scale search. *Trinity Industries, Inc. v. OSHA*, 16 F.3d 1455, 1460 (6th Cir. 1994). In that case, OSHA relied upon Instruction CPL 2.45A, which subjected facilities to full-scope comprehensive inspections if: "(1) an employee complaint has been filed that sets forth reasonable grounds for the Secretary of Labor to believe that a violation or danger exists; (2) the establishment is in an industry with a high lost workdays injury rate; (3) a complete safety inspection of the facility has not been carried out in the current year or in the last two fiscal years; and (4) the facility's safety records show a lost workday injury rate at or above the national average." *Id.* at 1457-58. Much as OSHA argues here that the filing of a complaint plus the implication of certain food processing SIC codes should allow it to expand its inspection, in *Trinity Industries*, OSHA "argue[d] that an employee complaint is only one of four conditions that

---

[14] A "programmed" inspection is one "scheduled based upon objective or neutral selection criteria. . . . The worksites are selected according to national scheduling plans for safety and for health under local, regional, and national special emphasis programs." OSHA FOM § 2-9. All other inspections are "unprogrammed."

must be satisfied before the Secretary may expand a limited complaint inspection under Section 8(f) into a full-scope inspection under Section 8(a). *Id.* at 1460. The Sixth Circuit rejected the argument, since it

> ignores the primary importance placed by the Court in *Barlow's* on the neutrality of the initial selection process provided by an administrative plan. In short, no matter how objective the other criteria of CPL 2.45A may be, the initiation of a search under the plan hinges on the filing of an employee complaint. Thus, the full-scope inspection authorized by the regulation cannot be the product of the kind of reasonable administrative inspection plan proposed in *Barlow's*.

*Id.*; 5 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 10.2(d) (4th ed. 2009) (the reasonable administrative plan envisioned by *Barlow's* may not include, even as one of several elements, an employee complaint); *see Sarasota Concrete*, 693 F.2d at 1068. The same holds here. Allowing OSHA to rely upon the NEP and LEP to expand the scope of an unprogrammed inspection would allow any malcontented employee the power to instigate a site-wide, comprehensive inspection. The Court is mindful of the fact that "[t]he intrusiveness of a full scope inspection is not insignificant. They often extend over a period of weeks. . . . Moreover, they create disruption, inconvenience, and lost employee time." *Sarasota Concrete*, 693 F.2d at 1069 n. 9. Permitting any

employee the power to essentially shut down the facility just by filing an OSHA complaint would directly contravene the neutrality principle explained in *Barlow's*.

Moreover, the Amputation NEP, by its own terms, does not apply on these facts. It only permits full-site *programmed* inspections based upon the development of inspection lists.[15] (Doc. 1-3 at 6-7.) While it

---

[15] In relevant part, the Amputation NEP reads:

3. Developing Inspection Lists. Using the most recently available Dun & Bradstreet employer list prepared by the National Office, each Area and Regional Office will prepare a master list of establishments using the identified SIC codes referenced at Section IX(B)(7) of this directive.

4. Area Offices will add to the master list general industry establishments where amputation injuries or fatalities related to machinery and equipment have occurred in the five years preceding the effective date of this directive. Local evidence of amputations will be based on IMIS accident data and, if available, workers' compensation data, OSHA 200 and OSHA 300 data, NIOSH data, and other reliable sources of information (e.g., reports of amputations from hospital admissions, Emergency Medical Services, fire department, and police reports). The basis for an addition to the master list must be documented.

* * *

Based on local knowledge, Regional and Area offices may delete establishments that are not likely to have the targeted machinery and equipment, or firms known to be out of business, documenting the basis for such determinations. CSHOs will proceed with the programmed inspection where it has been determined that a new business is using the same plant and equipment of the previous business. Further, any establishment, other than those where amputations are known to have occurred which had a comprehensive safety inspection in the previous 24 months, will be deleted from the list.

Once the master list with additions and deletions is completed, each

contemplates the possibility of unprogrammed amputation inspections, it never authorizes a full-site inspection in such circumstance—instead it directs compliance officers to track such inspections, though they may embark upon a full-scale inspection if a programmed inspection "is also scheduled."[16] (*Id.* at 10-11.) A full-site inspection may one day be warranted under the Amputation NEP, but OSHA should follow its own procedures in accordance with that neutral administrative plan. It has made no showing that this has been done here.

---

establishment is to be assigned a sequential number, starting at the top of the list with number one. The Random Number Table (see the most current version of OSHA instruction CPL 02-00-025) will then be applied to create the first cycle of five to fifty establishments. Subsequent cycles will be created in the same way until all establishments on the list have been assigned to a cycle. Cycles may be created all at once or as needed and need not be the same size.

Inspections may then be scheduled using the first cycle list. Establishments on the cycle list may be inspected in any order, so that Area Office resources are efficiently used. Once a cycle has begun, all establishments in the cycle will be inspected before a new cycle is begun, except for carryovers that will be allowed as provided in OSHA Instruction CPL 02-00-025. . . .

If cycles are not prepared, establishments on the inspection list are to be inspected in the order determined by the application of the Random Number Table.

(Doc. 1-3 at 6-7.)

[16] OSHA cites to *Appeal of Carondelet Coke Corp.*, 741 F.2d 172 (8th Cir. 1984), but in that case a complaint inspection was expanded to a full-scale inspection when the business was already qualified for a programmed inspection—OSHA represented that a "programmed search would have been carried out within several months even if an employee complaint had never been filed." *Id.* at 177.

Troublingly, Ewing stated in his affidavit supporting the warrant that he "was assigned the task of conducting a comprehensive *programmed* safety and health inspection . . . [that] was formalized in accordance with the OSHA Directive establishing the [NEP] on Amputations, because the complainant alleged that an amputation hazard existed. . . ." (Doc. 1-5 at 2 (emphasis added).) Ewing's assertion that the inspection was "programmed" is dubious at best. Indeed, OSHA now admits that the search was unprogrammed. (Doc. 7 at 7.) And it insists that it "*never* represented to this Court that the instant inspection was a planned or programmed inspection under an administrative plan containing specific neutral criteria." (*Id.* at 7 (emphasis added).) "Rather, OSHA stated to this Court that the inspection properly included investigation of hazards covered under the applicable National and Local Emphasis Programs, and hazards that Compliance Officer Ken Ewing discovered while investigating complaint items, including hazards observed in plain sight, hazards identified through review of the Employer's accident logs, and hazards identified during interviews related to the investigation of complaint items." (*Id.*)

Putting to the side Ewing's affidavit, the apparent import of OSHA's earlier representations along that line, and the inapplicability of the Amputation NEP on these facts, OSHA labors under the misimpression that the NEP and Sanitation LEP can be bootstrapped into an unprogrammed inspection in order to expand the scope of an initial complaint-based search beyond complaint items into a "comprehensive" search. That it cannot do.

Taking the emphasis programs out of the picture, there is no cause for a comprehensive inspection in this instance. Additionally, the warrant is impermissibly broad in other respects. It permits OSHA to call in an Industrial Hygienist just in case "Ewing encounters a hazard addressed by an OSHA health standard (such as noise exposure, hazardous materials exposure)." (Doc. 7 at 18.) Similarly, if Ewing determines that a PSM specialist is warranted, he may call one in.[17] (Doc. 3 at 3.) In other words, Ewing has unbridled discretion to expand

---

[17] OSHA states in its response that it "determined that the Employer's quantities of anhydrous ammonia well-exceeded the 10,000 pound threshold quantity under Appendix A to 29 C.F.R. § 1910.119," so a PSM expert is warranted. (Doc. 7 at 19.) It cites to no probable cause evidence supporting its assertion, however. Nor has it offered any evidence indicating that the chemical is not properly stored or poses any danger to Crider's employees. That is, while a PSM expert may be warranted as to the anhydrous ammonia's storage and use, it does not warrant a full-scale PSM investigation.

the scope of the search, which is exactly the scenario that the Supreme Court condemned in *See v. City of Seattle*, 387 U.S. at 545, in holding that an administrative search cannot be left to the "unreviewed discretion of the enforcement officer in the field."

While the Court is satisfied that OSHA has demonstrated probable cause supporting a *limited* inspection beyond the complaint items, it has not offered any plausible reason for expanding this into a comprehensive, wall-to-wall search.[18]

---

[18] In support of its exceedingly broad warrant, OSHA points to language in *Sarasota Concrete* noting that

> it is conceivable that a specific violation plus a past pattern of violations may be probable cause for a full scope inspection. In addition, a specific complaint may allege a violation which *permeates* the workplace so that a full scope inspection is reasonably related to the complaint.

693 F.2d at 1069 (emphasis added); *see also* FOM § 15-6 ("Warrant applications for establishments where consent has been denied for a limited scope inspection (i.e., complaint, referral, accident investigation) shall normally be limited to the specific working conditions or practices forming the basis of the inspection. However, a broad scope warrant may be sought if there is evidence of potentially pervasive violative conditions or if the establishment is on a current list of establishments targeted for a comprehensive inspection."). It also cites to *International Matex Terminals-Bayonne*, 928 F.2d at 626, for the proposition that a wall-to-wall inspection may be justified based upon specific complaint items. (Doc. 7 at 12.)

## IV. CONCLUSION

Based upon the foregoing, the Court finds that the Crider warrant was improvidently issued and thus Crider's motion to quash should be **GRANTED**. (Doc. 4.) OSHA is free to seek a new warrant that complies with the legal parameters set forth above. Because the motion to quash should be granted, the government's motion for a hearing (doc. 10) is **DENIED**.

**SO REPORTED AND RECOMMENDED** this  30th  day of March, 2010.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT of GEORGIA

---

OSHA's assertion that the amputation problems "permeate" the workplace is overstated. Violations that "permeate" the workplace include site-wide issues, such as ventilation or electrical system problems. *Int'l Matex Terminals-Bayonne*, 928 F.2d at 625-26 (permitting broad inspection when during a consensual inspection an OSHA compliance officer saw electrocution and fire/explosion hazards "to a large extent everywhere," poor house cleaning throughout the plant, and calculated that the facilities lost workday incident rate was 3.5 times the national rate); *Sarasota Concrete*, 693 F.2d at 1069 (noting that ventilation hazards may permeate the workplace). Each hazard here, on the other hand, is localized, relating to individual electrical outlets and machines. Moreover, while OSHA insists that there were a high number of injuries reported in the OSHA 300 logs, it has not offered the lost workday incident rate. (Doc. 7 at 13-14.) Consequently, the Court cannot meaningfully evaluate whether the injury rate is out of the ordinary. Nor has it shown a pattern of past violations warranting a full-scope inspection.